# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In re the Dependency of:

T.V.M. (DOB: 02/03/2006)

        Minor child.

THOMAS McMAHON,

        Appellant,

v.

STATE OF WASHINGTON,
DEPARTMENT OF SOCIAL AND
HEALTH SERVICES,

        Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

DIVISION ONE

No. 74520-4-I
(consol. with No. 74521-2-I)

UNPUBLISHED OPINION

FILED: September 26, 2016

DWYER, J. – Thomas McMahon appeals the trial court's order terminating his parental rights to his son, T.V.M. McMahon contends that the Department of Social and Health Services failed to prove, as required by RCW 13.34.180(1), that (1) continuation of the parent-child relationship would clearly diminish T.V.M.'s prospects for a stable and permanent home, (2) all necessary and available services capable of correcting his parental deficiencies were provided to him, (3) there was little likelihood that his parental deficiencies could be remedied so that T.V.M. could be returned to him in the near future, and (4) he was currently unfit to parent T.V.M. Because substantial evidence supports the

trial court's findings as to each of these elements, which in turn support the conclusions of law terminating McMahon's parental rights, we affirm.

I

T.V.M. was born on February 3, 2006 to McMahon and Nicole Brown. Shortly after T.V.M.'s birth, Brown ended her relationship with McMahon, and she and T.V.M. moved in with her mother, Valarie Wheeler. According to Wheeler, for the next few months, McMahon left daily messages on her voicemail stating that "he couldn't wait to find us, he wanted to put a gun to my head and pull the trigger, and he wanted to kill [Brown] and . . . [T.V.M.]".

McMahon saw T.V.M. only "a handful of times" as a baby and a toddler, typically when Brown brought T.V.M. for a visit. When T.V.M. was approximately a year old, Brown became romantically involved with another man, Steve Melville. T.V.M. grew up with Melville as a father figure and never learned that McMahon was his biological father.

In 2008, McMahon was charged with first degree manslaughter. He was convicted and sentenced to approximately eight years in prison.

The Department became involved with the family in early 2014 when Brown was arrested on multiple felony charges related to methamphetamine use and identity theft. The Department filed a dependency petition and T.V.M. was placed with Wheeler. The shelter care hearing order provided that parent-child visitation would take place once a week for two hours "if parent is not incarcerated."

2

McMahon agreed to dependency in August 2014. The juvenile court prohibited the parties from informing T.V.M. that McMahon was his biological father until a guardian ad litem was appointed for T.V.M. and consulted with T.V.M.'s counselor. However, the juvenile court ordered that McMahon could have "supervised visits [with T.V.M.] at the father's correctional institution, if approved by [T.V.M.'s] counselor."

In approximately September 2014, McMahon wrote a letter to T.V.M. from prison introducing himself as T.V.M.'s father. McMahon began to write T.V.M. regularly. The record contains a total of 16 cards and letters that McMahon wrote, as well as some drawings McMahon made for T.V.M. McMahon sent these items to T.V.M. in care of the Department. Based on the juvenile court's order, the Department placed them in the case file but did not provide them to T.V.M.

In January 2015, T.V.M. began attending therapy with counselor Courtney Salazar. Salazar diagnosed T.V.M. with an anxiety disorder stemming from his history of neglect and began working with him to develop coping skills.

At a dependency review hearing in March 2015, the juvenile court amended the visitation provisions to provide that McMahon "may write letters which the department will hold" and that T.V.M.'s counselor "will help determine if, when and how it is appropriate to introduce him to his father and provide him the letters." The juvenile court also ordered that McMahon participate in a psychological evaluation and substance abuse treatment, based on the

Department's determination that these services were available at the facility where McMahon was incarcerated.

At a dependency review hearing in July 2015, McMahon requested that the Department be compelled to inform T.V.M. of the identity of his father. The Department did not take a position on McMahon's request, but stated that any such conversation should take place in a therapeutic environment. Salazar declined to make a recommendation as to whether T.V.M. should be informed that McMahon was his father, stating that her role was to help T.V.M. develop coping skills to manage his anxiety. Salazar stated that she was willing to "assist the family in facilitating a conversation to disclose this information to [T.V.M.]." The juvenile court denied McMahon's request, stating:

> The father does not have a relationship with his son currently. [T.V.M.] does not know who his biological father is. The father may write letters which the department will hold.

> In person visitation poses a risk to the child's health, safety, and welfare. . . . The court finds that there is a current concrete risk of harm shown, the father has threatened the life of the child and of the caregivers in the past. The decision to introduce the father to the child is to be made by the family/caregivers since they are in the best position to determine when it is to be done. Court will not breach this given the facts before the court.

The Department filed a termination petition. When the termination trial commenced in November 2015, T.V.M. was nine years old.

Donald DeShazer, McMahon's classification counselor at Airway Heights Corrections Center, testified that McMahon's early release date was February 11, 2016, approximately three months away. However, DeShazer testified that

McMahon could not be released until he had submitted a release address, which he had not done. DeShazer stated that if McMahon did not have an approved release address, he could be held until his maximum release date of November 17, 2016. DeShazer also testified that McMahon had received five major infractions since 2011, four of which were for either fighting or intimidation.

Department social worker Jill Balch opined that it would take "[n]ine months to a year of solid recovery and progress and building relationship after his release" before McMahon could parent T.V.M. Another Department social worker, Patricia Morgan, also testified it would take "roughly a year" of living in the community before T.V.M. could be placed with McMahon. Dr. Paul Wert, who conducted McMahon's psychological evaluation, testified that McMahon would need to demonstrate stability for "a lengthy period of time . . . a year or two years" after his release before McMahon could assume a parenting role with T.V.M.

On December 14, 2015, the trial court entered findings of fact and conclusions of law and an order terminating McMahon's parental rights. McMahon appeals.[1]

II

Parental rights are a fundamental liberty interest protected by the United States Constitution. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71

---

[1] Brown relinquished her parental rights and is not a party to this appeal.

L. Ed. 2d 599 (1982). To terminate parental rights, the State must satisfy a two-step test. First, it must prove the following statutory elements by clear, cogent, and convincing evidence:

> (a) That the child has been found to be a dependent child;
>
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
>
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
>
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
>
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . . ; [and]
>
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1).

In 2013, the legislature amended RCW 13.34.180(1)(f) to add three specific factors that a trial court must consider if a parent is incarcerated at the time of the trial:

> If the parent is incarcerated, the court shall consider whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department or supervising agency made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers

experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

RCW 13.34.180(1)(f); In re Dependency of D.L.B., ___ Wn.2d ___, 376 P.3d 1099, 1109 (2016). A trial court's assessment of RCW 13.34.180(1)(f) in cases involving an incarcerated parent must be "informed by evidence presented and conclusions reached regarding the six factors contained in RCW 13.34.145(5)(b)." In re Dependency of A.M.M., 182 Wn. App. 776, 787, 332 P.3d 500 (2014). Those factors are:

(i) The parent's expressions or acts of manifesting concern for the child, such as letters, telephone calls, visits, and other forms of communication with the child;

(ii) The parent's efforts to communicate and work with the department or supervising agency or other individuals for the purpose of complying with the service plan and repairing, maintaining, or building the parent-child relationship;

(iii) A positive response by the parent to the reasonable efforts of the department or the supervising agency;

(iv) Information provided by individuals or agencies in a reasonable position to assist the court in making this assessment, including but not limited to the parent's attorney, correctional and mental health personnel, or other individuals providing services to the parent;

(v) Limitations in the parent's access to family support programs, therapeutic services, and visiting opportunities, restrictions to telephone and mail services, inability to participate in foster care planning meetings, and difficulty accessing lawyers and participating meaningfully in court proceedings; and

(vi) Whether the continued involvement of the parent in the child's life is in the child's best interest.

RCW 13.34.145(5)(b).

If the trial court finds that the State has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(1).

Findings of fact must be supported by substantial evidence. In re Dependency of K.N.J., 171 Wn.2d 568, 577, 257 P.3d 522 (2011). Unchallenged findings of fact are verities on appeal. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001). In determining whether substantial evidence supports the trial court's findings, we will not weigh the evidence or the credibility of witnesses. In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003).

III

McMahon contends that the trial court erred by concluding that the Department met its burden under RCW 13.34.180(1)(f) in light of the additional factors relevant to incarcerated parents. We disagree.

McMahon first argues that "but for the Department's interference and steadfast opposition to visitation, [he] could have had a meaningful role in his son's life." Br. of Appellant at 21. The record does not support this claim. Between T.V.M.'s birth in 2006 and McMahon's incarceration in 2008, McMahon had very minimal contact with T.V.M. He saw T.V.M. only a few times, when Brown brought T.V.M. to see him. Though Wheeler testified that she has had the same telephone number for all of T.V.M.'s life, McMahon never made any

attempts to call and talk to T.V.M. Instead, McMahon would call Wheeler and threaten her, Brown, and T.V.M. Although McMahon ultimately began writing to T.V.M. from prison, he did not begin doing so until September 2014, by which time T.V.M. was eight years old. These cards and letters were an attempt to establish a relationship with T.V.M. for the first time, not maintain an existing bond. This is evidenced by the fact that, at trial, McMahon had difficulty remembering both the day and the year of T.V.M.'s birth.[2]

Based on this evidence, the trial court made the following unchallenged findings.

> 2.12 The child does not know that Mr. McMahon is his biological father. He believes that another man, Steven, the mother's former long-term boyfriend, is his father.
>
> 2.33 The father has not maintained a meaningful role in his child's life. There was no meaningful role between the father and [T.V.M.] to maintain. [T.V.M.] does not know Mr. McMahon, or that he is his father.
>
> 2.34 Prior to his incarceration, Mr. McMahon did not participate much in his son's upbringing. He last saw his son seven and a half years ago, when [T.V.M.] was two years old.
>
> 2.40 Mr. McMahon never made any efforts to establish a parenting plan, either prior to or during his incarceration. Prior to the dependency, and since his incarceration in 2008, Mr. McMahon has never tried to locate his child or establish contact.

Because McMahon does not challenge these findings of fact, they are verities on appeal.

---

[2] McMahon also struggled to remember the birthdates of his other two sons, whose care is not at issue in this appeal.

Next, McMahon argues that the Department failed to make "reasonable efforts." Though the statute does not define "reasonable efforts," Division Three of this court has recently interpreted the term "to require DSHS to make reasonable efforts to help the incarcerated person remedy parental deficiencies." In re Parental Rights to M.J., 187 Wn. App. 399, 408, 348 P.3d 1265 (2015).

Here, the evidence supports the trial court's finding that the Department made reasonable efforts to remedy McMahon's parental deficiencies. The Department ensured that McMahon was able to participate in his two court-ordered services—substance abuse treatment and a psychological evaluation— while incarcerated. Department social workers kept in regular contact with McMahon by mail, by telephone, and in person in order to keep him apprised of the status of the case. They also regularly provided him with photographs and updates about T.V.M.

Contrary to McMahon's claim, the Department did not "actively bar" McMahon's efforts to have visitation or communication with T.V.M. Instead, Department social workers provided McMahon with prestamped envelopes so that he could begin writing to T.V.M., referred T.V.M. for mental health counseling, and asked T.V.M.'s therapist to assess whether contact with McMahon would be appropriate for T.V.M. However, in July 2015, the juvenile court prohibited the Department from ever informing T.V.M. about McMahon, finding that McMahon's threatening behavior presented a risk of harm to T.V.M.

The juvenile court ordered that only Wheeler, T.V.M.'s prospective adoptive placement, could make the decision to introduce T.V.M. to McMahon.

Finally, McMahon challenges the trial court's finding regarding the particular barriers McMahon faced while incarcerated:

> 2.36 The father has taken advantage of programs offered to him within the Department of Corrections but his access to services is limited while incarcerated. The father also has limitations on his ability to reunify with his son while he is incarcerated. He cannot speak directly to his son on the phone, he cannot engage in reunification counseling with his son, and cannot visit with him. The father has also had some limited ability to speak with Department social workers.

McMahon does not appear to challenge the trial court's finding that such barriers existed. It is undisputed that they do. Rather, he argues that the trial court should have found that these barriers prevented him from maintaining a meaningful role in T.V.M.'s life. But, as discussed above, McMahon did not have a meaningful relationship with T.V.M. before he was incarcerated. Nor did he attempt to establish such a relationship until after the Department filed a dependency petition.

In short, the record is clear that the trial court properly considered the relevant statutory factors pertaining to incarcerated parents. The trial court's finding that McMahon's legal relationship with T.V.M. clearly diminished his prospects for early integration into a stable and permanent home was supported by substantial evidence.

IV

McMahon contends that the Department failed to prove that it offered or provided all necessary services capable of correcting his parental deficiencies as required by RCW 13.34.180(1)(d). He argues that the Department should have offered supervised or therapeutic visitation to enable him to form a relationship with T.V.M. But while "[t]here may be situations where visitation is part of a required service," such as a parenting class, visitation itself does not correct parental deficiencies and is, therefore, not a "service" that must be provided. In re Dependency of T.H., 139 Wn. App. 784, 792, 162 P.3d 1141 (2007). Moreover, at no point during the dependency proceedings was the Department authorized to provide in-person visitation to McMahon.

McMahon also challenges the trial court's finding that there was little likelihood that T.V.M. could be returned to his care in the near future. But this finding was supported by substantial evidence. Balch, Morgan, and Dr. Wert all testified that McMahon would need to be able to demonstrate sobriety and a prosocial, crime-free lifestyle for at least a year after he was released before assuming custody of T.V.M. And McMahon does not challenge the trial court's finding that "[t]he near future for [T.V.M.] is one year or less."

Finally, McMahon contends that the trial court erred in finding that he was currently unfit to parent. Citing In re Welfare of Sego, 82 Wn.2d 736, 740, 513 P.2d 831 (1973), McMahon argues that incarceration alone cannot render him unfit. But "a parent's inability to perform his parental obligations because of

12

imprisonment, the nature of the crime committed, as well as the person against whom the criminal act was perpetrated are all relevant to the issue of parental fitness and child welfare, as are the parent's conduct prior to imprisonment and during the period of incarceration." Sego, 82 Wn.2d at 740.

Here, McMahon's incarceration was not the sole basis for the trial court's finding. Unchallenged finding of fact 2.20 demonstrates the trial court also considered McMahon's "criminal history, prison infractions, and substance abuse history" in finding that McMahon was unfit to parent. And it was undisputed that, at the time of trial, McMahon had no parental relationship with T.V.M. Substantial evidence supported the trial court's finding of unfitness.

We affirm the trial court's order terminating McMahon's parental rights to T.V.M.

WE CONCUR:

2016 SEP 26 AM 9: 49

13